673 F.2d 984
 1982-1 Trade Cases 64,576, 9 Fed. R. Evid. Serv. 1683
 Jeffrey B. BATTLE; Karen Battle; d/b/a Bayview Service and
Supply Co.; and Anchor Supply Co., Inc., Appellants,
Gordon Watson and Thomas Watson,
v.
The LUBRIZOL CORPORATION; Jenkin-Guerin, Inc.; and Jack K.
Krause, Appellees.
 No. 81-1585.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 10, 1981.
Decided March 4, 1982.
 
 Paul H. Schramm, M. Harvey Pines (argued), Schramm, Newman, Pines & Freyman, Clayton, Mo., for appellants.
 C. William Portell, Jr. (argued), Harry G. Neill, Jr., Richard Wolff, St. Louis, Mo., for appellees Jenkin-Guerin, Inc. and Jack K. Krause.
 Robert H. Rawson, Jr. (argued), A. Theodore Gardiner, III, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Walter M. Clark, Thomas E. Wack, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for appellee The Lubrizol Corp.
 Before HEANEY and McMILLIAN, Circuit Judges, and BENSON,* Senior District Judge.
 McMILLIAN, Circuit Judge.
 
 
 1
 Jeffrey B. Battle, Karen Battle and two businesses which they control, Anchor Supply Co. (Anchor) and Bayview Service & Supply Co. (Bayview), appeal the district court's order of summary judgment and dismissal of their private antitrust action alleging that appellees, the Lubrizol Corporation, Jenkin-Guerin, Inc., and Jack K. Krause, president of Jenkin-Guerin, violated inter alia § 1 of the Sherman Act, 15 U.S.C. § 1. In that complaint, appellants charged that Lubrizol, a manufacturer of rustproofing compounds, conspired with one of its distributors, Jenkin-Guerin, to terminate appellants' distributorship for the purpose of restraining price competition. Appellants do not offer evidence to prove an anticompetitive effect on the market and rely solely on the principle enunciated in Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164 (3d Cir. 1979) (Cernuto), that the concerted action alleged here, aimed at limiting price competition, has a per se anticompetitive impact on the market. The district court followed the per se analysis in Cernuto, but found the evidence insufficient to support a reasonable inference that appellants' termination by Lubrizol was motivated by a desire to protect Jenkin-Guerin from price competition and granted summary judgment against appellants. Battle v. Lubrizol Corp., 513 F.Supp. 995 (E.D.Mo.1981).
 
 
 2
 For reversal appellants argue that the evidence was sufficient to support an inference that Lubrizol stopped selling directly to appellants in order to protect appellants' competitor, Jenkin-Guerin, from price competition. For the reasons discussed below, we reverse and remand for further proceedings.
 
 Facts
 
 3
 Lubrizol manufactures and sells Lubrizol 2085A, a rustproofing compound. Jenkin-Guerin is a wholesale distributor of chemical compounds, one of which is Lubrizol 2085A. Jenkin-Guerin packages and sells Lubrizol 2085A under the trademark "Anchor Tuflex." For a period of several months in late 1978 and 1979, Anchor Supply Co., controlled by Battle, purchased Lubrizol 2085A from Jenkin-Guerin and unsuccessfully attempted to compete for a share of the automobile rustproofing market. In July of 1979, appellants approached Lubrizol with a proposal to distribute Lubrizol 2085A for marine vessel and industrial rustproofing uses as well as limited automotive uses. Because of the competitive pricing aspects of the marine market, appellants requested a direct supply from Lubrizol at a lower price than they could obtain from Jenkin-Guerin. Interested in expanding into the marine market, Lubrizol agreed to supply Lubrizol 2085A directly to Bayview Service & Supply Co., another company controlled by Battle.
 
 
 4
 Although appellants apparently made some unsuccessful attempts to enter the marine vessel rustproofing market during the next few months, between October and December of 1979, Anchor was actively marketing Lubrizol 2085A under the name "Armor Shield" for automotive uses and soliciting Jenkin-Guerin's customers with some success by undercutting Jenkin-Guerin's prices. Sometime in January of 1980, Jack Krause, president of Jenkin-Guerin, learned of appellants' actions and made a series of telephone calls to Irwin Ehren, manager of rustproofing products for Lubrizol. It is undisputed that in these telephone calls Krause complained that appellants were selling Lubrizol 2085A to Jenkin-Guerin customers at prices lower than Jenkin-Guerin's. Krause was "upset" and wanted to know whether Lubrizol would continue to sell Lubrizol 2085A to appellants. There is evidence from one of Krause's coworkers that before making one of these calls, Krause had commented to the office staff that he intended to force Lubrizol to stop supplying appellants with Lubrizol 2085A, and that after phoning Lubrizol, Krause boasted that he had done so.
 
 
 5
 Relying on the information supplied by Krause, Ehren informed George Arkedis, manager of Lubrizol's diversified products division, of the substance of the conversations. Arkedis then told William Bares, president of Lubrizol, that appellants were active in the automotive market rather than marine market and that Krause was concerned about the price competition. On February 26, 1980, Bares ordered that the direct supply of Lubrizol 2085A to Bayview be terminated. Subsequently, Lubrizol put appellants in contact with a Cleveland distributor of the compound, Eaton Oil Co., but Lubrizol has not reestablished direct supply. Appellants have been able to purchase Lubrizol 2085A through Eaton Oil. Appellants, however, now pay more for Lubrizol 2085A from Eaton Oil than when they bought from Lubrizol directly, although appellants still sell Lubrizol 2085A at a price which is lower than that offered by Jenkin-Guerin. Appellants brought this suit charging, inter alia, that Lubrizol and Jenkin-Guerin conspired to terminate their distributorship for the purpose of protecting Jenkin-Guerin from price competition in violation of § 1 of the Sherman Act. Appellees maintain that the distributorship was terminated because appellants misrepresented their intended marketing plans when applying for a direct supply and because appellants were not honest in the negotiations.
 
 Summary Judgment
 
 6
 This appeal followed the entry of summary judgment. Summary judgments are somewhat disfavored in antitrust cases, especially when motive or intent is at issue. See Poller v. Columbia Broadcasting System, 368 U.S. 464, 491, 82 S.Ct. 486, 495, 7 L.Ed.2d 458 (1962). However, summary judgment is not necessarily precluded in antitrust litigation. As noted by the Supreme Court in First National Bank v. Cities Service Co., 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968):
 
 
 7
 While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an anti-trust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.
 
 
 8
 See also Aladdin Oil Co. v. Texaco, Inc., 603 F.2d 1107, 1110-12 (5th Cir. 1979). Like the district court, we must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences without assessing credibility. Only if the evidence is so one-sided that it leaves no room for any reasonable difference of opinion as to any material fact should the case be decided by the court as a matter of law rather than be submitted to the jury. See, e.g., Admiral Theatre Corp. v. Douglas Theatre Co., 585 F.2d 877, 883 (8th Cir. 1978).
 
 
 9
 "Vertical" Horizontal Restraint or "Horizontal" Vertical Agreement ?
 
 
 10
 This case presented the following question of law: after Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (GTE Sylvania ), is the per se rule or the rule of reason appropriate in determining whether a technically vertical restraint of trade, which smacks of horizontal pricing interference, unduly restrains trade under § 1 of the Sherman Act. If the rule of reason is the appropriate test to prove a violation of § 1, a plaintiff must show that the combination or conspiracy produced actual anticompetitive effects within the relevant market. Appellants in the present case made no attempt to proffer such market evidence but instead argued that the alleged conspiracy constitutes a per se violation of the Act, thus requiring no proof of actual harmful impact on the market.
 
 
 11
 Per se violations are exceptions to the rule of reason. Northern Pacific R.R. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958), set forth the standard for a per se violation: "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal." "Among those business practices that have been treated as per se violations are price fixing, resale price maintenance, group boycotts, tying arrangements, and certain types of reciprocal dealing." Cernuto, supra, 595 F.2d at 166 (footnotes omitted). United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129 (1940) (Socony-Vacuum), continues to stand for the principle that conduct with the purpose and effect of restraining price movement and the free play of market forces among competitors is illegal per se: "Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they ... stabilized prices they would be directly interfering with the free play of market forces." See also National Society of Professional Engineers v. United States, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978) (central importance of price). Here, appellants alleged that one distributor successfully foreclosed the possibility of price competition by a competitor through a combination or conspiracy with a common supplier. Such conduct, once proven, appellants argue, would be an example of that "pernicious" behavior condemned by Socony-Vacuum.
 
 
 12
 The Supreme Court, however, declared in GTE Sylvania that because vertical trade restraints, i.e., those imposed by a supplier or manufacturer on a distributor, may have redeeming procompetitive aspects, a rule of reason analysis should be used to determine the net effect on the market. In GTE Sylvania, a manufacturer terminated the plaintiff's distributorship when the plaintiff began to sell the product at an outlet outside its allotted territory. The Court upheld this action, reasoning that while the manufacturer's exclusive franchise marketing plan might stifle intrabrand competition or competition among dealers of the same product in a given area, it could also serve to stimulate interbrand competition or competition among different manufacturers of comparable products. 433 U.S. at 56-58, 97 S.Ct. at 2560-2562.
 
 
 13
 Appellees argue that GTE Sylvania precludes use of the per se rule for any vertically imposed restraint except those expressly retained by the GTE Sylvania decision, i.e., price fixing and resale price maintenance, id. at 51 n.18, 97 S.Ct. at 2558, n.18. See Oreck Corp. v. Whirlpool Corp., 579 F.2d 126 (2d Cir.) (banc), cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978) (applying rule of reason analysis); accord, Gough v. Rossmoor Corp., 585 F.2d 381 (9th Cir. 1978), cert. denied, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); H & B Equipment Co. v. International Harvester Co., 577 F.2d 239 (5th Cir. 1978); see generally Comment, Vertical Agreements to Terminate Competing Distributors: Oreck Corp. v. Whirlpool Corp., 92 Harv.L.Rev. 1160 (1979) (supporting Oreck); Comment, Vertical Agreement as Horizontal Restraint: Cernuto, Inc. v. United Cabinet Corp., 128 U.Pa.L.Rev. 622 (1980) (supporting Cernuto). We agree, however, with the Third Circuit that such an expansive interpretation of GTE Sylvania is unwarranted absent a clear expression of such intent by the Supreme Court. Cernuto, supra, 595 F.2d at 167 n.15, citing GTE Sylvania, supra, 433 U.S. at 51 n.18, 97 S.Ct. at 2558 n.18. See also Contractor Utility Sales Co. v. Certain-Teed Products Corp., 638 F.2d 1061, 1072 n.9 (7th Cir. 1981) (Contractor Utility ). Like the Cernuto court, "we are not persuaded that the law's tolerance of reasonable restraints designed to improve the manufacturer's competitive position may be converted into a blanket allowance of any marketing decision made by a manufacturer." 595 F.2d at 167-68 (emphasis in original). As noted by Professor Sullivan,
 
 
 14
 It does not follow from the fact that a manufacturer may, when franchising a dealer, commit itself not to franchise another in a territory defined by the manufacturer, that it may, having earlier franchised two or more dealers, agree at the request of one to terminate the others. It is not merely that the latter promise liquidates palpable interests of existing traders, while the former does not (a difference which is real enough, and which is charged with meaning for the procedural and damage aspects of the law); it is also that the competitive effect of the first promise is less severe than that of the second. The first commitment forecloses potential intrabrand competition only; the second stamps out existing competition at the behest of a firm which is suffering under it.
 
 
 15
 ....
 
 
 16
 ... When the manufacturer sets up a dealership structure and binds itself not to add dealers in any existing territory, we truly have a vertical structure. But when an existing dealer enlists the manufacturer to choke off one of the dealer's competitors, although the "agreement" which enables Section 1 to be invoked is vertical ( (manufacturer-dealer) ), the restraint thereby achieved is horizontal in its impact ( (dealer-dealer) ); it is an attack by one dealer against another.
 
 
 17
 L. Sullivan, Antitrust § 148, at 427-29 (1977). "The supplier (or manufacturer) participates merely as the 'enforcement agent' in furthering the distributors' (or dealers') anticompetitive and horizontal purposes." Comment, Vertical Agreement as Horizontal Restraint, supra, 128 U.Pa.L.Rev. at 635, citing Posner, The Rule of Reason and the Economic Approach: Reflections on the Sylvania Decision, 45 U.Chi.L.Rev. 1, 17 (1977) (Professor Posner recently advanced a per se legality theory of restricted distribution; see Posner, The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality, 48 U.Chi.L.Rev. 6 (1981)).
 
 
 18
 Moreover, there are significant differences between the alleged conspirators' intent and the competitive impact found in GTE Sylvania and in the present case. First, as noted in Cernuto,
 
 
 19
 (w)hen a manufacturer acts on its own, in pursuing its own market strategy, it is seeking to compete with other manufacturers by imposing what may be defended as reasonable vertical restraints. This would appear to be the rationale of the GTE Sylvania decision. However, if the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier. Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer, level.
 
 
 20
 595 F.2d at 168. Thus, the alleged purpose and effect of the dealer termination in the present case was to eliminate or reduce intrabrand competition at the dealer or distributor level and not to increase interbrand competition at the manufacturer or supplier level as in GTE Sylvania. Second, GTE Sylvania involved a nonprice vertical restraint, a restriction on the location from which the dealer could sell the manufacturer's products. 433 U.S. at 37, 97 S.Ct. at 2551. In contrast, price and price competition was allegedly the key factor in the present case and in Cernuto, supra, 595 F.2d at 168-69; in each case the dealer complained to the manufacturer that the competing dealer was selling the manufacturer's products in its territory and at lower prices.
 
 
 21
 In United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (a decision prior to, but expressly affirmed by GTE Sylvania, supra, 433 U.S. at 58 n.28, 97 S.Ct. at 2561 n.28), the Court found a per se violation where the manufacturer bowed to retailers' complaints by pressuring other retailers not to deal with discounters. Although General Motors involved dual conspiracies, retailer-retailer and retailer-manufacturer, the Court's application of the per se rule points to the importance of the underlying horizontal nature of the arrangement. 384 U.S. at 144-45, 86 S.Ct. at 1330-1331. Substance should be more important than form.
 
 
 22
 We do not think the horizontal impact is diminished because the alleged combination or conspiracy consists of only one member of the plaintiff's distribution level and a common supplier. Compare Alloy International Co. v. Hoover-NSK Bearing Co., 635 F.2d 1222, 1224 (7th Cir. 1980) (single dealer), and Cernuto, supra, 595 F.2d at 165 (single dealer), with Gough v. Rossmoor Corp., supra, 585 F.2d at 387 ("In all cases so far holding such restraints to be per se unreasonable, there has been some horizontal concert of action taken against the victims of the restraint."); Oreck Corp. v. Whirlpool Co., supra, 579 F.2d at 131-33; H & B Equipment Co. v. International Harvester Co., supra, 577 F.2d at 245 ("Conspiracies between a manufacturer and its distributors are only treated as horizontal, however, when the source of the conspiracy is a combination of the distributors."). As noted in Comment, Vertical Agreement as Horizontal Restraint, supra, 128 U.Pa.L.Rev. at 641-42 (emphasis in original, footnotes omitted):
 
 
 23
 (H)orizontal plurality is not the real determinant of per se unreasonableness. The essence of a violation of section 1 of the Sherman Act is agreement to pursue illegal conduct. A combination to cut a retailer off from a source of supply is not any less an illegal agreement because only one, rather than a plurality, of the parties is on the affected level. Nor is the effect of the combination any less harmful. A dealer's success in using the refusal-to-deal weapon to strike at a competitor depends on enlisting the cooperation of their mutual supplier, not the other competing dealers.
 
 
 24
 If a distributor can establish that a manufacturer or common supplier terminated its existing supply relationship at the request of a competing distributor and the termination was motivated by a desire on the part of the manufacturer to reduce or eliminate price competition for the other distributor, then a per se violation of § 1 of the Sherman Act has been established. Contractor Utility, supra, 638 F.2d at 1072 & n.9; Alloy International Co. v. Hoover-NSK Bearing Co., supra, 635 F.2d at 1224; Cernuto, supra, 595 F.2d at 170. Here, the district court found that the evidence, when viewed in the light most favorable to appellants, was sufficient to support the reasonable inference that Lubrizol and Jenkin-Guerin acted in concert, but insufficient to support the reasonable inference that Lubrizol acted with a desire to protect Jenkin-Guerin from price competition, and therefore granted summary judgment against appellants. 513 F.Supp. at 998-99. We will address these requirements individually.
 
 Concerted Action
 
 25
 In finding an inference of concerted action, the district court considered: (1) Krause's telephone calls to Lubrizol complaining of appellants' competition and the subsequent termination by Lubrizol of appellants and (2) evidence that Krause boasted to his office staff that, first, he could pressure Lubrizol into cutting off appellants' supply and, later, that he had in fact been successful. The district court concluded that the evidence of Krause's complaints and Lubrizol's subsequent termination of appellants' direct supply, standing alone, was insufficient to raise an inference of concerted action, id. at 997, but that this evidence, when considered with Krause's statements to his office staff, was sufficient to raise an inference of concerted action. Id. at 998.
 
 
 26
 Lubrizol argues, however, that Krause's statements are inadmissible as hearsay against Lubrizol under Fed.R.Evid. 801(d)(2)(E) because there was insufficient independent evidence to show that the parties were participating in a conspiracy and the statements were not made "in furtherance of a conspiracy." Krause's statements would be admissible against him only under Fed.R.Evid. 801(d)(2)(A) as admissions. See United States v. Bell, 573 F.2d 1040 (8th Cir. 1978); United States v. Macklin, 573 F.2d 1046 (8th Cir.), cert. denied, 439 U.S. 852, 99 S.Ct. 160, 58 L.Ed.2d 157 (1978). Because we agree that Krause's statements to his office staff were not made "in furtherance of the conspiracy," see United States v. Wilson, 490 F.Supp. 713, 714 (E.D.Mich.1980), aff'd per curiam, 639 F.2d 314 (6th Cir. 1981); United States v. Green, 600 F.2d 154, 157-58 (8th Cir. 1979) (per curiam), we must consider whether the complaints and subsequent termination, standing alone, are sufficient to raise a reasonable inference of concerted action.
 
 
 27
 In Edward J. Sweeney & Sons v. Texaco, Inc., 637 F.2d 105 (3d Cir. 1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), the Third Circuit considered a similar question. Sweeney, a discount gasoline wholesaler and distributor, had a favorable hauling agreement changed and later his distributorship terminated after other Texaco retailers complained of his price cutting practices. In affirming a summary judgment against Sweeney, the majority held as a matter of law that the mere temporal relation between complaints by competitors and termination by a common supplier does not necessarily raise an inference of concerted action:
 
 
 28
 The necessary first step toward appellants' proof of a prohibited § 1 conspiracy was proof of a causal relationship between competitor complaints that Sweeney was selling Texaco gasoline several cents below their own price, and the reduction of Sweeney's hauling allowance. The mere reception of complaints by Texaco would be insufficient to prove this causal nexus. Nor would it suffice to prove only that some Texaco employees who knew of the complaints were also the ones who decided to terminate Sweeney's distributorship agreement and change its hauling allowance. The evidence must permit the inference that the alleged conspirators "had a unity of purpose or a common design and understanding, or a meeting of the minds."
 
 
 29
 Id. at 111 (citations and footnote omitted). To hold otherwise would disrupt normal and reasonable business communications between a supplier and its customers. As noted by the majority in Sweeney,
 
 
 30
 There are special reasons for applying this precept to a case in which a manufacturer receives price cutting complaints from competitors of a particular customer. To permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of its independent business judgment and emasculate the terms of the statute. As Professor Areeda has explained, many cut off dealers in this situation will be tempted to harass their former suppliers with treble damage suits. Recognizing the potential for harassment, courts should hesitate to scrutinize too closely the supplier's ambiguous refusal to sell.
 
 
 31
 Id. at 111 n.2, citing P. Areeda, Anti-Trust Analysis 560 (2d ed. 1974).
 
 
 32
 In Sweeney, the majority reviewed Sweeney's evidence and concluded that the evidence failed to show that Texaco's actions had contradicted the refiner's economic self-interest, proof of acts against economic interest and motivation to enter an agreement being the " 'two elements generally considered critical in establishing conspiracy from evidence of parallel business behavior.' " Id. at 114, citing Venzie Corp. v. United States Mineral Products Co., 521 F.2d 1309, 1314 (3d Cir. 1975). By lowering the hauling allowance, Texaco saved $58,000 per year in sales to Sweeney, an action not in contradiction to its economic interests and which thus negated one element necessary to establishing concerted action circumstantially. 637 F.2d at 114. Moreover, the majority also found that the facts "militate(d) strongly against a causal relation between the complaints and Texaco's actions." Id. Texaco had realized its unfavorable position in its hauling agreement with Sweeney some five years prior to taking action. It had also learned of Sweeney's practice of representing non-Texaco fuel as Texaco fuel and had received many consumer complaints about service and credit card irregularities at Sweeney's stations.
 
 
 33
 We agree with the majority in Sweeney that the mere receipt by a manufacturer of dealer complaints about another dealer's market behavior would not be sufficient evidence to raise an inference of concerted action. Id. at 111 (mere reception of complaints by Texaco would be insufficient to prove causal nexus between competitor complaints that Sweeney was selling Texaco gasoline several cents below their own price and the reduction of Sweeney's hauling allowances). However, we do not agree that "even if appellants had demonstrated that Texaco's actions were in response to these complaints, such evidence alone would not show the necessary concerted action." Id. at 110, 116. To the contrary, we conclude that proof of a dealer's complaints to the manufacturer about a competitor dealer's price cutting and the manufacturer's action in response to such complaints would be sufficient to raise an inference of concerted action. See id. at 124-25 (Sloviter, J., dissenting). A showing of responsive action on the part of the manufacturer is necessary; there must be evidence of a causal relationship between the competitor dealer's price-related complaints and the manufacturer's action. "(T)he mere fact that the manufacturer/supplier took some action will not suffice to establish the requisite combination unless such action was taken in response to such complaints." Id. at 125 (Sloviter, J., dissenting).
 
 
 34
 We hold only that evidence of receipt by the manufacturer of a competitor dealer's price-related complaints and responsive action by the manufacturer against the offending dealer raises a reasonable inference of concerted action in violation of section 1 of the Sherman Act. Such evidence does not conclusively establish liability. As noted in Comment, Vertical Agreement as Horizontal Restraint, supra, 128 U.Pa.L.Rev. at 647-48 (footnotes omitted):
 
 
 35
 A manufacturer may have numerous legitimate reasons for terminating a dealer that coincide with the illegitimate reasons of the distributor demanding termination of its competitor. For instance, a violation of a distribution contract may come to the manufacturer's attention only through the complaint of another dealer that maintains a close and jealous watch upon its rivals' activities.* ..
 
 
 36
 ....
 
 
 37
 ... This evidence might include explanations such as the dealer's violation of a marketing agreement, protection of product integrity, unsatisfactory dealer performance, instability of the dealer's business, the dealer's dishonesty, shortage of supply, or reorganization of the marketing system.
 
 
 38
 Here, we think there was sufficient evidence to raise an inference of concerted action. Appellants presented evidence that Krause complained to Lubrizol about appellants' price cutting and sales to Jenkin-Guerin customers in January 1980, that Lubrizol actually received these complaints, that the Lubrizol officials who made supply decisions knew about these complaints and the substance of the complaints, and that Lubrizol terminated appellants' direct supply of Lubrizol 2085A in February 1980, thus eliminating appellants as competitors on the same level of distribution as Jenkin-Guerin and reducing the difference between appellants' prices and Jenkin-Guerin's prices. This evidence is circumstantial. However, we think that it is most unlikely that antitrust plaintiffs, like any other plaintiffs alleging conspiracy, will have direct evidence.
 
 
 39
 Lubrizol argues that it terminated appellants' direct supply because appellants violated their marketing agreement to develop principally marine applications for Lubrizol 2085A and because appellants were dishonest in their pre-distribution negotiations. Lubrizol also argues that its actions were unilateral and wholly independent of Krause's complaints. We think that these arguments are properly directed to the jury. The jury could have reasonably found that, as appellants contend, Lubrizol terminated appellants' direct supply pursuant to an understanding or agreement with Jenkin-Guerin for the purpose of reducing price competition between Jenkin-Guerin and appellants or that, as Lubrizol and Jenkin-Guerin contend, Lubrizol independently decided to terminate appellants' direct supply and did so for reasons that were not price-related.
 
 Price-related Complaints
 
 40
 In the preceding discussion we presumed that Krause's complaints to Lubrizol were in fact price-related. The district court, however, found that there was no evidence to support the inference that Lubrizol was motivated by a desire to protect Jenkin-Guerin from price competition and that Krause's complaints did not show that Krause was concerned with price competition. 513 F.Supp. at 999. The second finding is contradicted by the record and by the district court's memorandum opinion which states that "Krause, in his capacity of chief operating officer of Jenkin-Guerin, complained to Lubrizol that (appellants) were selling to Jenkin-Guerin's automotive customers at a price under that offered by Jenkin-Guerin." Id. at 997.
 
 
 41
 We agree that there is no direct evidence that Lubrizol was motivated by a desire to protect Jenkin-Guerin from price competition. We would be somewhat surprised to find any direct evidence of this nature. However, there was sufficient circumstantial evidence, when viewed most favorably to appellants, to suggest that Lubrizol terminated appellants' direct supply of Lubrizol 2085A in order to protect Jenkin-Guerin from price competition. Krause's complaints clearly referred to appellants' lower prices; Krause wanted to know whether Lubrizol would continue to sell Lubrizol 2085A to appellants. The record indicates that Jenkin-Guerin was Lubrizol's third largest purchaser of Lubrizol 2085A during 1979 and most of 1980. Under the circumstances, we think that this evidence reasonably supports an inference that Lubrizol was motivated by a desire to protect Jenkin-Guerin from price competition.
 
 
 42
 Accordingly, we reverse the order of summary judgment and remand the case for further proceedings. The only issue before us on appeal was the propriety of summary judgment. We of course express no opinion whatsoever with respect to the merits of the position of any party to this action.
 
 
 43
 BENSON, Senior District Judge, dissenting.
 
 
 44
 I respectfully dissent.
 
 
 45
 In argument before this court, appellants-plaintiffs did not take issue with the trial court's findings that:
 
 
 46
 Plaintiffs herein admit that they are unable to establish the anti-competitive effect necessary to prove a violation of the Sherman Act under the rule of reason.
 
 
 47
 Battle v. Lubrizol Corporation, 513 F.Supp. 995, 998 (E.D.Mo.1981).
 
 
 48
 The trial court, however, has been reversed on a holding of this panel that there is evidence in the case which "reasonably supports an inference that Lubrizol was motivated by a desire to protect Jenkin-Guerin from price competition," ante, at 993, thereby presumably proving a per se unreasonable restraint of trade violation of the Sherman Act. The evidence in the case which this panel concludes is sufficient to support the inference is best set out by quoting from the trial court's opinion:
 
 
 49
 Lubrizol's evidence in this regard has not been disputed by plaintiffs. Lubrizol never discussed with plaintiffs the price at which they should resell Lubrizol 2085A. Jeffrey Battle, in his deposition, even went so far as to state that Lubrizol told him that what he did with the product after he acquired it was none of Lubrizol's business, and that Lubrizol didn't want to know what Battle charged for it. Likewise, Gordon Watson testified that Lubrizol never suggested the price at which Jenkin-Guerin should resell the product. After it refused to sell directly to plaintiffs, Lubrizol put plaintiffs in contact with its Cleveland area distributor, who now supplies plaintiffs with all the Lubrizol 2085A they desire. Plaintiffs continue to resell the product at a price lower than that offered by Jenkin-Guerin.
 
 
 50
 Against this evidence that Lubrizol was not, in fact, motivated by a desire to protect Jenkin-Guerin from price competition when allegedly agreeing with Jenkin-Guerin to terminate plaintiffs, plaintiffs' only evidence is that Krause mentioned price when complaining to Lubrizol.
 
 
 51
 Id. at 999.
 
 
 52
 Neither the appellants nor this panel suggest that the trial court has misstated the evidence. The panel's comments that:
 
 
 53
 Krause's complaints clearly referred to appellants' lower prices; Krause wanted to know whether Lubrizol would continue to sell Lubrizol 2085A to appellants. The record indicates that Jenkin-Guerin was Lubrizol's third largest purchaser of Lubrizol during 1979 and most of 1980.
 
 
 54
 ante, at 993, merely enlarge the trial court's findings without significantly changing them.
 
 
 55
 There is no suggestion from any of the parties in the case that additional evidence is available to be brought before the court. The case relates to a business arrangement that is essentially "vertical." To hold that the facts, all undisputed, could conceivably support a finding of a per se violation seems to me to extend the per se doctrine beyond that heretofore enunciated by the courts. See White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); Mackey v. National Football League, 543 F.2d 606 (8th Cir. 1976), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1978); Butera v. Sun Oil Company, Inc., 496 F.2d 434 (1st Cir. 1974); Worthen Bank & Trust Company v. National BankAmericard Incorporated, 485 F.2d 119 (8th Cir. 1973), cert. denied, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974).
 
 
 56
 I would affirm the decision of the district court.
 
 
 
 *
 The Honorable Paul Benson, Chief Judge, United States District Court for the District of North Dakota, sitting by designation
 
 
 *
 Indeed, one of the manufacturer's most valuable sources of information about the operation of its distribution channel is communications from its dealers. See Comment, Vertical Agreements to Terminate Competing Distributors: Oreck Corp. v. Whirlpool Co., 92 Harv.L.Rev. 1160, 1169 (1979)