Gary BIGELOW, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 87–249.

Supreme Court of Wyoming.

Jan. 27, 1989.

---

Leonard D. Munker, State Public Defender, Gerald M. Gallivan, Director, WDAP, Daniel M. Hesse and Michael K. Cornia, Student Interns, WDAP, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., and Terry L. Armitage, Asst. Atty. Gen., for appellee.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and BROWN, J., Retired.*

URBIGKIT, Justice.

This case involves burglary and conspiracy to commit burglary convictions in violation of W.S. 6-3-301[1] and W.S. 6-1-303.[2] Gary Bigelow (appellant) and other prisoners in the Natrona County Jail hatched and executed the generally unsuccessful effort with appellant's primary defense now being that the participants only conspired to rob other establishments and not burglarize the Wonder Bar which became the final target. Therefore, the "wrong" conspiracy was charged. After the jury found appellant guilty of both burglary and conspiracy to commit burglary, he was sentenced to consecutive terms of six to eight years.

Appellant phrases the issues as whether:
[T]here was sufficient evidence of a conspiracy to allow conviction.
[T]he letters from Studer and statements made by Bonner and Studer were inadmissible hearsay.
[A]dmission of the hearsay statements was harmless error.

We affirm.

## I. FACTS

Appellant was incarcerated in the Natrona County Jail from November 6, 1986 to March 8, 1987. Starting with the second week in February 1987 until appellant's release, he was confined in a large cell with several individuals, including Russell Fleetwood, George Studer, and Herb Bonner. Christopher Dvorak also shared this confinement intermittently since he was only serving weekends. It was in this period from the second week in February 1987 until March 8, 1987 that the conspiracy between these people, Everett Gunnett, Gwendi Poledna and appellant, allegedly occurred. Fleetwood and Dvorak testified as to what occurred in the jail, although neither one was charged as a co-conspirator. Studer was the alleged hub of the conspiracy and had become acquainted with Gunnett from sharing correctional time at the State Boys' School in Worland. This friendship was renewed after a few years of divergence and Studer moved in with the Gunnett family. It was through Gunnett's sister, Evelyn, that Studer knew Poledna. As well, Studer was acquainted with Bonner because they both had a common ac-

---

* Retired June 30, 1988.

1. W.S. 6-3-301(a) provides:
   (a) A person is guilty of burglary if, without authority, he enters or remains in a building, occupied structure or vehicle, or separately secured or occupied portion thereof, with intent to commit larceny or a felony therein.

2. W.S. 6-1-303 provides:
   (a) A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons that they or one (1) or more of them will commit a crime and one (1) or more of them does an overt act to effect the objective of the agreement.
   (b) A person is not liable under this section if after conspiring he withdraws from the conspiracy and thwarts its success under circumstances manifesting voluntary and complete renunciation of his criminal intention.
   (c) A conspiracy may be prosecuted in the county where the agreement was entered into, or in any county where any act evidencing the conspiracy or furthering the purpose took place.

quaintance of Howard Hamlin, who was the manager of the Wonder Bar. Bonner, the only person named in the indictment as having conspired with appellant to burglarize the Wonder Bar, boasted of his employment as bartender of the Wonder Bar, where he had been working for a few years; however, he had been terminated prior to his incarceration. His "bragging" after recollecting after hour activities such as roof parties, progressed to explaining his knowledge of the building layout, security system, and even the safe combination.

As the activities proceeded, it became known around the jail that Bonner and appellant did not get along. Studer, the scribe among the parties, wrote two letters which played a part in the plot. The first letter postmarked February 20, 1987 was sent from Studer to Gunnett and encouraged Gunnett to help appellant ease into the transitional period after his release from incarceration. The second letter postmarked February 25, 1987 was sent by Studer to Poledna and asked that Poledna pick up appellant when he was released. Moreover, in this correspondence, Studer asked that Poledna get a ski cap, a jump suit, and a BB gun from Gunnett. Although Studer's motivations for this last request were not apparent at the time, he testified at appellant's trial that it was made at the urging of Bonner so he could set him up. On Sunday, March 2, 1987, Poledna and Evelyn Gunnett started comparing the two [3] letters; adding two and two and not coming up with four, they decided to share the contents of this correspondence with Al Gunnett, Evelyn Gunnett's stepfather.

Al Gunnett delivered the letters to the police who instructed Poledna and Evelyn Gunnett to talk with appellant, Studer, and Bonner on the following Monday evening to acquire further information. Poledna complied with the visitation request and visited with Bonner, Studer and appellant, each in turn, to only learn from Studer that "they" were planning on robbing Kentucky Fried Chicken and Peaches and from Bonner that Studer could not be trusted. On the next Thursday, Bonner told Poledna to come by the jail about 8:30 p.m. that night. Bonner told her at that meeting "[t]hat Gary [appellant] was not going to trust Studer's judgment and that they were going to do another place, do a bar is what he said." When appellant was released from jail on that Thursday, Dvorak picked him up as arranged. Poledna was called twice the next evening by appellant; once he was told that Gunnett would be better for the job, and the second time, after apparently deciding to proceed with Gunnett's inclusion in the plot, appellant left a phone number where he could be reached. Gunnett, although not a present crony, was not unknown to the other cast of players since Studer and he had been old boys' school mates, and Fleetwood and Gunnett had socialized a lot and shared a common background. In a complex effort as initiated by the police, Gunnett contacted appellant for a meeting. Gunnett, wired, kept this appointment as was evidenced by the tapes which were produced of the resulting conversation. Appellant advised Gunnett of the layout and the combination to the safe of the Wonder Bar, which had been learned from Bonner.

On March 7, 1987, as following the developed plan, appellant had Gunnett drive him to a place close to the Wonder Bar where he subsequently paid his cover charge and had a few drinks, portraying the role of a normal patron. Appellant, as had been planned, left the main serving area acting as though he were going to the restroom, but continued on and instead went through the hatch door in the roof. Appellant, while hiding in the crawl space, indicated he had "a change of heart." [4] Delayed

---

**3.** Actually, three letters were introduced into evidence. Two were addressed to Poledna from Studer and appellant respectively; the other one was addressed to Gunnett sent by Studer. Only the admission of the letter to Poledna from Studer and the letter to Gunnett from Studer are being questioned. However, the pertinence

even at trial of the letter to Poledna from appellant is not clear, since it innocuously discussed her taking him to Denver to buy a car when he was released.

**4.** Appellant appropriately does not argue that this constituted a withdrawal from the conspiracy because there was not affirmative evidence

when the band and manager stayed until approximately 5:30 a.m. and then realizing how "bad" the situation looked, appellant waited to depart until after bar personnel had gone to be caught by the waiting police when he went out the bar's back door. The dollar bills from a shake-a-day jar were discovered missing as apparently picked up by him on attempted departure.

Convicted of conspiracy to commit burglary as well as the substantive offense of burglary, appeal is only taken from the conspiracy count.[5]

## II. SUFFICIENCY OF THE EVIDENCE

Our standard of evidentiary review has been examined numerous times.

" 'In reviewing the sufficiency of evidence in a criminal case, this court makes a painstaking review of the record to determine if the evidence is sufficient to permit the jury to reach the conclusion that it did. [Citation.] The court will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that a defendant was proved guilty of the offense charged. [Citation.] The court considers the evidence in the light most favorable to the verdict and will assume that the jury disbelieved any testimony in conflict with the result it reached. [Cita-

tion.]' *State v. Richardson,* Minn., 393 N.W.2d 657, 661–662 (1986)."

*Scadden v. State,* 732 P.2d 1036, 1052 (Wyo.1987) (quoting *DeSersa v. State,* 729 P.2d 662, 664 (Wyo.1986)). See also for the sufficiency rule, *Roose v. State,* 759 P.2d 478 (Wyo.1988); *Righter v. State,* 752 P.2d 416 (Wyo.1988); and *Carson v. State,* 751 P.2d 1315 (Wyo.1988). Appellant narrows the sufficiency inquiry by only contending that there was not enough evidence to support the conspiracy conviction.

This court in *Jasch v. State,* 563 P.2d 1327, 1332 (Wyo.1977) defined conspiracy as:

A conspiracy is an agreement between two or more persons to do an unlawful act. The crime of conspiracy is complete when an agreement has been made and overt acts performed to further the unlawful design. *Goldsmith v. Cheney,* 10 Cir.1971, 447 F.2d 624.

The elements of the general conspiracy statute, W.S. 6-1-303, have been defined as: "(1) an agreement between one or more persons to commit a crime, and (2) an overt act to effect the objective of the agreement." [6] *Burke v. State,* 746 P.2d 852, 855 (Wyo.1987). The overt act is the manifestation of the conspiracy at work. *Schultz v. State,* 751 P.2d 367, 371 (1988); 2 W. LaFave and A. Scott, Substantive Criminal Law § 6.5 at 94 (1986).

The gravamen of appellant's attack is on the agreement[7] aspect of the conspiracy charge. Appellant argues that there is no

---

in addition to the withdrawal of the thwarting of the conspiracy's success "under circumstances manifesting voluntary and complete renunciation of his criminal intention." W.S. 6-1-303(b). See also *United States v. Xheka,* 704 F.2d 974 (7th Cir.), cert. denied 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); Project, *White–Collar Crime: Survey of Law–1983 Update,* 21 Am.Crim.L.Rev. 179, 216 (1983); 2 W. LaFave and A. Scott, Substantive Criminal Law §§ 6.4 and 6.5(f) (1986); and 4 D. Louisell and C. Mueller, Federal Evidence § 427 at 338–39 (1980).

**5.** Although appellant in context barely got peanuts, the analogy to cheese and a baited trap is not inapposite. An entrapment defense was not made. At the same time, the conspiratorial activities were indeed a poorly kept secret. His oppressive luck was not to end, since a plea bargain at preliminary hearing, which was sin-

gularly better than the final sentence, went awry to result in his proceeding to trial and convictions. A comprehensive inculpatory statement given in pursuit of the plea negotiations was suppressed following a pretrial motion in limine, but the information contained was obviously of no detriment to prosecution and of no benefit to appellant in trial planning and presentation.

**6.** An overt act is not a requirement under Wyoming's controlled substances conspiracy statute. See W.S. 35–7–1042; *Burke v. State,* 746 P.2d 852, 855 n. 1 (Wyo.1987); and *Apodaca v. State,* 627 P.2d 1023 (Wyo.1981).

**7.** This agreement requirement has a long history.

The first significant expansion of conspiracy occurred with the decision by the Court of Star Chamber in 1611 of Poulterers' Case.

substantial evidence of an agreement between appellant and Bonner; therefore, without a meeting of the minds, a conspiracy could not occur. Appellant's misconception is twofold. First, the meeting of the minds theory relates to a bilateral approach to conspiracy which this court has expressly rejected.

"One might suppose that the agreement necessary for conspiracy is essentially like the agreement or 'meeting of the minds' which is critical to a contract, but this is *not* the case. Although there continues to exist some uncertainty as to the precise meaning of word in the context of conspiracy, it is clear that the definition in this setting is somewhat more lax than elsewhere. A mere tacit understanding will suffice, and there need not be any written statement or even a speaking of words which expressly communicates agreement. * * *

"Because most conspiracies are clandestine in nature, the prosecution is seldom able to present direct evidence of the agreement. Courts have been sympathetic to this problem, and it is thus well established that the prosecution may 'rely on inferences drawn from the course of conduct of the alleged conspirators.' "[8]

*Burke,* 746 P.2d at 855 (quoting W. LaFave and A. Scott, Criminal Law, § 61 at 460–61 (1972) (emphasis added)).[9]

■ Appellant's second misconception is that only evidence relating to the conspiracy between the *charged* individuals can be considered, essentially resting on the premise that if the individual is not charged, he cannot be a co-conspirator. While Bonner was the only other individual charged, the evidence from the other individuals is not precluded from consideration. A conspiracy need not be charged for a joint venturer to be considered a co-conspirator. See *Burke,* 746 P.2d at 855; *Jasch,* 563 P.2d at 1333 and cases cited therein.[10] This court

The defendants had confederated to bring a false accusation against one Stone, but Stone was so clearly innocent that the grand jury refused to indict him. This being so, it was the contention of the defendants that no conspiracy had occurred, but the court decided to the contrary. Thus, Poulterers' Case gave rise to a doctrine which survives to this day: the gist of conspiracy is the agreement, and thus the agreement is punishable even if its purpose was not achieved.

W. LaFave and A. Scott, Criminal Law § 61 at 453–54 (1972).

8. This leniency view has been criticized as unfair to criminal defendants with Judge Learned Hand describing conspiracy as the "darling of the modern prosecutor's nursery." *Harrison v. United States,* 7 F.2d 259, 263 (2d Cir.1925). Justice Jackson, in a concurring opinion in *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), analogized conspiracy to an " 'elastic, sprawling and pervasive offense, * * * so vague that it almost defies definition [and also] chameleonlike [because it] takes on a special coloration from each of the many independent offenses on which it may be overlaid.' " W. LaFave and A. Scott, Criminal Law, supra n. 7, at 456. Some commentators have summed up the problem and suggested that " 'it is hard to find an antidote for the poison you cannot identify.' " W. LaFave and A. Scott, Criminal Law, supra n. 7, at 456 (quoting Mitford, The Trial of Dr. Spock at 61 (1969)).

The United States Supreme Court in *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), reh'g denied sub nom. *Goldsmith v. United States,* 332 U.S. 856, 68 S.Ct. 385, 92 L.Ed. 425, reh'g denied sub nom. *Weiss v. United States,* 332 U.S. 856, 68 S.Ct. 385, 92 L.Ed. 425, reh'g denied sub nom. *Feigenbaum v. United States,* 332 U.S. 856, 68 S.Ct. 385, 92 L.Ed. 425 (1948) has explained this wide latitude:

"Secrecy and concealment are essential features of successful conspiracy. The more completely they are achieved, the more successful the crime. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others. Otherwise the difficulties, not only of discovery, but of certainty in proof and of correlating proof with pleading would become insuperable, and conspirators would go free by their very ingenuity."

2. W. LaFave and A. Scott, Substantive Criminal Law, supra, at 66.

9. For further discussion of the bilateral versus unilateral approach to conspiracy, see 2 W. LaFave and A. Scott, Substantive Criminal Law, supra, at 73 n. 107 (that Wyoming statutorily takes the unilateral approach); and Note, *Conditional Objectives of Conspiracies,* 94 Yale L.J. 895, 906–07 n. 64 (1985).

10. The extensive amount of literature on this subject is in agreement that a conspiracy need

in *Jasch,* 563 P.2d at 1332, adopted Judge Learned Hand's phraseology from *United States v. Olweiss,* 138 F.2d 798 (2d Cir. 1943), cert. denied 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047 (1944) in this regard:

"[A]nd any evidence admissible against Olweiss was admissible against them, so far as it consisted of conduct in furtherance of the joint venture in which all three were engaged. The notion that the competency of the declarations of a confederate is confined to prosecutions for conspiracy has not the slightest basis; their admission does not depend upon the indictment, but is merely an incident of the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal."

Further circumstantial evidence can be relied on to prove the conspiracy because of the covert nature of the crime itself. *Burke,* 746 P.2d at 855 (citing W. LaFave and A. Scott, Criminal Law, supra, at 460–61).[11] In any event, there was substantial evidence supplied by appellant through the taped conversations between Gunnett and himself to find a conspiracy to rob the Wonder Bar.[12] It is immaterial that the indictment lists the conspiracy participants as only Bonner and appellant. After reviewing this record, we find more than enough evidence to support the jury's finding that a conspiracy existed to burglarize the Wonder Bar.[13]

Appellant's argument based on the charging of the "wrong" conspiracy is premised on the scope of the conspiracy and is basically that the statements made

---

not be charged. See *United States v. Nixon,* 418 U.S. 683, 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *United States v. Kendricks,* 623 F.2d 1165 (6th Cir.1980); *United States v. Gil,* 604 F.2d 546 (7th Cir.1979); *United States v. Lyles,* 593 F.2d 182 (2d Cir.), cert. denied 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789, cert. denied sub nom. *Johnson v. United States,* 440 U.S. 975, 99 S.Ct. 1545, 59 L.Ed.2d 794, cert. denied sub nom. *Holder v. United States,* 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979); *United States v. Talbot,* 470 F.2d 158 (6th Cir.1972); *United States v. Rinaldi,* 393 F.2d 97, 99 (2d Cir.), cert. denied 393 U.S. 913, 89 S.Ct. 233, 21 L.Ed.2d 198 (1968); Report of Senate Committee on the Judiciary, Comments to F.R.E. 801; E. Cleary, McCormick on Evidence § 267 at 794 (3d ed. 1984); M. Dombroff, Trial Hearsay: Objections & Exceptions at 48 (1988); 11 J. Moore, Moore's Federal Practice § 801.50[6](E) (2d ed. 1988); and 4 D. Louisell and C. Mueller, supra n. 4, at 333–34.

**11.** See also *Dorador v. State,* 711 P.2d 417, 419 (Wyo.1985); *Grable v. State,* 649 P.2d 663, 677 (Wyo.1982); *McLaughlin v. State,* 626 P.2d 63, 65, 66 (Wyo.1981); *Jasch,* 563 P.2d at 1334; *State v. Thompson,* 273 Minn. 1, 139 N.W.2d 490, cert. denied 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966); Project, supra n. 4, 21 Am. Crim.L.Rev. at 211; and Note, *Inconsistencies in the Federal Circuit Courts' Application of the Coconspirator Exception,* 39 Wash. & Lee L.Rev. 125, 126 n. 12 (1982).

**12.** Part of the exchange exhibited from Gunnett's testimony during this drive succinctly stated the involvement:

Q. What did he say about Herb Bonner?
A. He told me that when he was in jail with Herb, had told him the way to get in, the

way to get to the safe, how to get in the safe, the combination and that Herb had been doing this because he was pretty angry with the Wonder Bar.

**13.** The officer testified from monitoring the conversations:

Q. From your monitoring the conversations did the defendant Gary Bigelow ever mention Herb Bonner by name?
A. Yes, he did.
Q. In what context?
A. Talking about Herb being sincere and being, giving him the combination to the safe of the Wonder Bar, that he had been an ex-employee, that he was sending his sister $2,000. and that was pretty much the contents of that portion, when mentioned Herb Bonner by name.

\* \* \* \* \* \*

A. He was explaining that Herb had told him not to worry about the sign that says there is an alarm or about setting the alarm system because the Wonder Bar can never afford to have it hooked up.

\* \* \* \* \* \*

A. When first out in front of 1711 Custer had a short conversation there, and Mr. Bigelow told Everett that he had gotten the combination of the safe from Herb, which Everett responded, Herb who? And then Mr. Bigelow explained that Herb was an ex-employee of the Wonder Bar. And again at 15th and Poplar was turning northbound again, talking about the combination at that time, I have got the combination supplied by Herb. When he mentioned him by name, Herb Bonner, and also *that he was going to send Herb's sister $2,000. out of the money he was going to get.* [Emphasis added.]

were not in furtherance of planning the Wonder Bar burglary. A proper foundational showing under W.R.E. 801(d)(2)(E) is for the State to show "(1) that a conspiracy exists, (2) membership of the declarant co-conspirator and the defendant in such conspiracy, and (3) that the declaration was uttered in the course of and in furtherance of the conspiracy." *Burke*, 746 P.2d at 865.

To determine if the situation exhibits one or several conspiracies, the totality of the circumstances must be considered. Some factors examined are: "(1) the number of alleged overt acts in common; (2) the overlap in personnel; (3) the time period during which the alleged acts took place; (4) the similarity in the methods of operation; (5) the locations in which the alleged acts took place; (6) the extent to which purported conspiracies share a common objective; and (7) the degree of interdependence needed for the overall operation to succeed." 2 W. LaFave and A. Scott, Substantive Criminal Law, supra, at 102 (footnotes omitted).

An agreement to commit several crimes is but one conspiracy. Several persons may be parties to a single conspiracy even if they have never directly communicated with one another; the question is whether they are aware of each other's participation in a general way and have a community of interest. Id. at 86.

■ For a person to be held responsible as a co-conspirator, a member need not be acquainted in a complex situation with the other members, D. Binder, Hearsay Handbook § 28.06 (2d ed. 1983), have direct dealings, 2 W. LaFave and A. Scott, Substantive Criminal Law, supra, at 71, know the identity of the others or all the details, W. LaFave and A. Scott, Criminal Law, supra, at 460–61.[14] The record amply demonstrates that appellant knew of the others' participation in the burglary scheme. "To prove that a statement has been made in

furtherance of a conspiracy, it need be shown only that the statement was intended to advance the objectives of the conspiracy." Comment, *Testing the Reliability of Coconspirators' Statements Admitted Under Federal Rule of Evidence 801(d)(2)(E): Putting the Claws Back in the Confrontation Clause*, 30 Vill.L.Rev. 1565, 1590–91 (1985). While mere bragging does not satisfy the in furtherance requirement, *Battle v. Lubrizol Corp.*, 673 F.2d 984, 990 (8th Cir.1982), cert. denied 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984), the boasts can be admissible under F.R.E. 801(d)(2)(E) when the declarant uses the information to obtain confidence of the co-conspirator. *United States v. McGuire*, 608 F.2d 1028, 1033 (5th Cir.1979), cert. denied sub nom. *Rivera v. United States*, 444 U.S. 1092, 100 S.Ct. 1060, 62 L.Ed.2d 782, reh'g denied 613 F.2d 315 (5th Cir.), cert. denied 446 U.S. 910, 100 S.Ct. 1838, 64 L.Ed.2d 262 (1980). See *United States v. Sears*, 663 F.2d 896, 905 (9th Cir.1981), cert. denied sub nom. *Werner v. United States*, 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982), description of robbery was in furtherance because of necessity to facilitate the escape; and *United States v. Pool*, 660 F.2d 547, 562 (5th Cir.1981), statements were admissible when found "necessary to keep them abreast of the conspiracy's current status." Ultimately, the fact that the other participants were not charged or that another conspiracy or two may have also occurred, is not material to the present issue if the information is found to have been made in furtherance of the Wonder Bar conspiracy when the totality of the circumstances are considered.

## III. HEARSAY

Appellant argues that the two letters—the one from Studer to Poledna and the one from Studer to Gunnett—should not have been admitted over his hearsay objections. The same rationale is used to try to exclude

---

**14.** For views on the complications of determining the "in furtherance" requirement, see: Comment, *Testing The Reliability of Coconspirators' Statements Admitted Under Federal Rule of Evidence 801(d)(2)(E): Putting The Claws Back In The Confrontation Clause*, 30 Vill.L.Rev. 1565 (1985); Note, supra n. 9, 94 Yale L.J. at 899, 908 (advocating a limitation to objects that were "objectively likely to occur or were believed by a conspirator to be likely to occur"); and Note, supra, n. 11, 39 Wash. & Lee L.Rev. at 127 n. 14 (and cases cited therein).

Poledna's testimony concerning discussion of restaurant robberies or that Bonner had informed her that he and appellant were planning on burglarizing the Wonder Bar. Consequently, the trial court's application of W.R.E. 801(d)(2)(E) [15] is at the center of this turmoil.[16]

The United States Supreme Court recently had occasion to reexamine the co-conspirator aspect of F.R.E. 801(d)(2)(E) [17] in *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).[18] Appellant essentially advocates that this court must adopt a standard of independent evidence [19] concerning the existence, membership, and scope of the conspiracy to

avoid the bootstrapping problems of *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, reh'g denied sub nom. *Kretske v. United States*, 315 U.S. 827, 62 S.Ct. 629, 86 L.Ed. 1222, reh'g denied sub nom. *Roth v. United States*, 315 U.S. 827, 62 S.Ct. 637, 86 L.Ed. 1222 (1942).

Appellant additionally advances the thesis that this court's majority holding in *Burke*, 746 P.2d 852, which required a prima facie showing of the conspiracy, is now inconsistent with the holding in *Bourjaily*, 107 S.Ct. at 2779, that the standard of proof of the conspiracy before admission is by a preponderance of the evidence. *Bourjaily*, however, did not decide if the con-

---

**15.** W.R.E. 801(d)(2)(E) is identical to F.R.E. 801(d)(2)(E) and provides:

> (2) Admission by Party–Opponent. —The statement is offered against a party and is * * * (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

**16.** This exception, which some call a "vicarious admission," accidentally arose. IV J. Wigmore, Wigmore on Evidence §§ 1079 and 1080a (1972); Mueller, *The Federal Coconspirator Exception: Action, Assertion, and Hearsay*, 12 Hofstra L.Rev. 323 (1984). The first manifestation of this exception was in the "English treason trials in the late eighteenth century, where defendants were charged with trying to import the French Revolution to English soil." Mueller, supra, 12 Hofstra L.Rev. at 325. The first adoption of this exception by the United States Supreme Court appeared in *United States v. Gooding*, 12 Wheat. 460, 25 U.S. 460, 461, 6 L.Ed. 693 (1827). Mueller, supra, 12 Hofstra L.Rev. at 329. The scope of the American exception has been defined as:

> The American coconspirator exception came to consist of three elements. Coconspirator statements were to be admissible over a hearsay objection if it could be shown (1) that declarant and defendant were coconspirators (the "co-venturer" requirement), and that the statement had been made (2) during the course of the venture (the "pendency" requirement), and (3) in furtherance thereof (the "furtherance" requirement). The framers of rule 801(d)(2)(E) elected not to alter the received American tradition, and instead carried it forward intact.

Mueller, supra, 12 Hofstra L.Rev. at 331 (footnotes omitted). Of further interest on the history aspect of this rule, see Levie, *Hearsay and Conspiracy: A Reexamination of the Co–Conspirators' Exception to the Hearsay Rule*, 52 Mich.L. Rev. 1159 (1954); Note, supra n. 11, 39 Wash. & Lee L.Rev. at 125; and W. LaFave and A. Scott, Criminal Law, supra at § 61.

**17.** See Annotation, *Admissibility Of Statement By Coconspirator Under Rule 801(d)(2)(E) Of Federal Rules of Evidence*, 44 A.L.R. Fed. 627 (1979) for a general analysis.

This popular issue has been reflected as: "Of all the subdivisions of Rule 801(d)(2), the coconspirator subdivision has attracted the most attention from litigants and the courts. The extra attention is due to the constitutional issues of the criminal arena, where safeguards are more scrupulously observed." M. Dombroff, supra n. 10, at 46. Some of the constitutional issues faced, for example, concern the confrontation clause, *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); Kirkpatrick, *Confrontation and Hearsay: Exemptions from the Constitutional Unavailability Requirement*, 70 Minn.L.Rev. 665 (1986); Comment, supra, 30 Vill.L.Rev. at 1592, and equal protection. See also Imwinkelried, *Of Evidence and Equal Protection: The Unconstitutionality of Excluding Government Agents' Statements Offered as Vicarious Admissions Against the Prosecution*, 71 Minn.L.Rev. 269, 272 (1986).

**18.** A provocative analysis of this decision can be found at Note, *Sixth Amendment—The Co–Conspirator Exemption to the Hearsay Rule: The Confrontation Clause and Preliminary Factual Determinations Relevant to Federal Rule of Evidence 801(d)(2)(E)*, 78 J. of Crim.L. & Criminology 915 (1988).

**19.** Many authorities discuss the differences between the standards of "proper proof" for the independent assessment required before admission. See *Burke*, 746 P.2d at 863 n. 2 (Urbigkit, J., dissenting in part and concurring in part); Annotation, *Comment Note.—Necessity and Sufficiency of Independent Evidence of Conspiracy To Allow Admission of Extrajudicial Statements Of Coconspirators*, 46 A.L.R.3d 1148 (1972); and 2 W. LaFave and A. Scott, Substantive Criminal Law, supra, at 66.

spiracy determination can rest solely upon the co-conspirator's statement since that was not the presented factual scenario. Fortunately, this court like the United States Supreme Court in *Bourjaily*, 107 S.Ct. at 2781, is not left with a bare assertion of the hearsay statement to support a pyramided conspiracy since other independent evidence was present to establish the existence of the conspiracy. D. Binder, *supra*, at 152 (2d. ed. 1983 & Supp.1988). Thus, any claim of error in the standard utilized to establish the existence of the conspiracy must be evaluated in relation to whether it was harmless error. See *United States v. James*, 609 F.2d 36 (2d Cir. 1979), cert. denied 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980), where the error was not substantial when viewed with the other evidence, so no substantial rights of the defendant were jeopardized and *United States v. Lyles*, 593 F.2d 182 (2d Cir.), cert. denied 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789, cert. denied sub nom. *Johnson v. United States*, 440 U.S. 975, 99 S.Ct. 1545, 59 L.Ed.2d 794, cert. denied sub nom. *Holder v. United States*, 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979). Cf. Note, *Federal Rule of Evidence 801(d)(2)(E) and the Confrontation Clause: Closing the Window of Admissibility for Coconspirator Hearsay*, 53 Fordham L.Rev. 1291, 1320 (1985) advocating that harmless error not be utilized in "close" cases.

■ In this case, the impact of the letters and Poledna's statements were minimal. The most critical and damaging testimony came from appellant himself through the taped conversations with Gunnett where appellant implicated himself. Clearly, these statements could be admitted independent of W.R.E. 801(d)(2)(E).

It should be noted that a party's participation in a conspiracy may be established by *his own* statement, which qualifies as an admission under Rule 801(d)(2)(A) when offered against him, and which may be received without invoking the coconspirator exception.

4 D. Louisell and C. Mueller, Federal Evidence § 427 at 332–33 (1980) (emphasis in original). Factually, this case is similar to *United States v. Hernandez*, 829 F.2d 988 (10th Cir.1987), cert. denied — U.S. —, 108 S.Ct. 1486, 99 L.Ed.2d 714, reh'g denied — U.S. —, 108 S.Ct. 2029, 100 L.Ed.2d 615 (1988), where the defendant's taped statements were strong independent proof of the conspiracy and thus admissible. We do not need to confine admissibility within a prima facie evidence premise as we consider this well developed factual foundation of conspiracy. Consequently, the Bourjaily standard of preponderance is no impedance to affirmed conviction.

Lastly, appellant challenges the order of proof. The four step order of proof was outlined in *Burke*, 746 P.2d at 866. Here again, we find no error that affected substantial rights when all the evidence is properly considered.

AFFIRMED.