Giuseppe **MONDELLO**, a/k/a
Joe Mondello, Appellant
(Defendant),

v.

The **STATE** of **Wyoming**,
Appellee (Plaintiff).

Mark Charles **JONES**, Appellant
(Defendant),

v.

The **STATE** of **Wyoming**,
Appellee (Plaintiff).

Nos. 91–17, 91–18.

Supreme Court of Wyoming.

Dec. 15, 1992.

Michael R. O'Donnell, Cheyenne (argued), for appellant Mondello.

Leonard D. Munker, State Public Defender, and David Gosar, Appellate Counsel (argued), for appellant Jones.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., Barbara L. Boyer, Sr. Asst. Atty. Gen., and Mary Beth Wolff (argued), Asst. Atty. Gen., for appellees.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT* and GOLDEN, JJ.

CARDINE, Justice.

This is a conspiracy to sell drugs case in which there was no evidence that Giuseppe Mondello, a/k/a Joe Mondello (Mondello) and Mark Charles Jones (Jones) ever sold any drugs to anybody. There was no drug distribution ring. There was no one in the business of selling narcotics except the State's informant. Over a period of one and a half years, Mondello did no more than give money or pay money to buy drugs for himself. The case was made by a drug dealer who, in exchange for testifying to an agreement with Mondello and Jones to sell drugs, avoided prosecution for his acknowledged crime.

In this consolidated appeal, Jones and Mondello appeal their convictions for conspiracy to deliver controlled substances, marijuana and cocaine. Proof of intent was established by evidence of a reverse sting operation mounted by police officers in which they sold one, but delivered two, ounces of cocaine to Mondello. The jury, being unable to agree, refused to convict Mondello of possession of cocaine with intent to distribute but convicted appellants of agreeing to sell cocaine and marijuana.

We reverse both convictions.

Appellant Jones raises the following issues:

I. Did the prosecutor's closing argument deprive the appellant [Jones] of a fair trial?

II. Should the verdict be set aside because it is not supportable by one of the two theories on which it was offered to the jury?

III. Is there insufficient evidence to support the verdict?

IV. Did the use of leading questions and inadmissable hearsay testimony deprive the appellant of a fair trial?

V. Did the cumulative effect of the errors deprive the appellant of [a] fair trial?

Mondello raises the following issues on appeal:

1. Did the District Court's jury instructions deny the appellant due process and a fair trial by allowing the jury to convict on conspiracies which were not charged?

2. Did the conduct of the prosecutor deny the appellant due process and a fair trial?

3. Was the conduct of law enforcement so outrageous as to deny the appellant due process?

4. Was the evidence of conspiracy insufficient to allow the jury to consider the charge?

The relevant facts of this case begin with a deal made around Thanksgiving 1988. Mondello gave a man named Ronnie Lee (Lee) $1,300.00 to obtain an ounce of cocaine for him. Lee, in turn, gave the money to a source named Dara Kenney. Lee never saw Dara Kenney, any cocaine, or the money again.

Mondello was angered at Lee, who he held responsible for the loss. He subsequently paid several visits to Lee's house to demand repayment of the $1,300.00. On one of these visits, Mondello brought along a "friend" who Lee estimated was six feet tall or more and weighed 300 pounds. On another visit, Mondello told Lee that he could place a call "East" and arrange to "get guns" or have arms broken. Lee became frightened because he had no way to repay the money, so he went to the police.

Lee was introduced to Officer Glick, a deputy sheriff on special assignment to work narcotics. It was agreed that Glick would pose as the person who was given Mondello's money. Glick and Lee met Mondello at Lee's residence, where Glick used the alias "Mike Melvin." Glick promised to repay Mondello the $1,300.00 Lee

---

*Chief Justice at time of oral argument.

owed him in exchange for Mondello letting Lee "off the hook." Glick paid Mondello $300.00 from state confiscated funds at that time. Over the next few weeks, Glick paid Mondello another $700.00, leaving $300.00 due.

Eight months later, during June 1989, Glick was reassigned by the sheriff's department, and his special assignment duties with narcotics came to an end. Essentially all that transpired during the eight-month period was repayment to Mondello of $1,000.00 by the State. The Mondello case sat dormant for the next year, or until June of 1990, when appellants Jones and Mondello met with a drug dealer named Chris Bascus (Bascus) at Bascus' home. Jones told Bascus that Mondello was looking for someone to get Mondello cocaine. Mondello wanted a supplier who could furnish him with an "eight ball" every other day. (An "eight ball" is 3½ grams of cocaine. An ounce contains forty-eight grams.)

Bascus, unknown to Mondello and Jones, had been arrested for selling cocaine and had turned informant for the government, i.e., cut a deal in which he would make a case against Mondello and avoid prosecution for his own crime. He testified at trial that the deal Mondello offered was to give Bascus $1,350.00 to buy an ounce of cocaine. Bascus was then to sell the cocaine and use the profits to buy more cocaine. Mondello would take back his stake in the form of either "an eight ball a week" for his personal use, or in cash. Bascus further testified that Mondello suggested that Bascus invest in and sell marijuana to build up his money supply faster. Bascus testified that Mondello was not interested in marijuana for his personal use, only cocaine. The plan also called for Jones to help sell whatever Mondello did not use. It was Bascus' testimony about this plan which formed the alleged conspiracy of which Mondello and Jones were convicted.

Bascus informed the police of details of the plan. He then made a recorded telephone call to Mondello for the police department on June 12, 1990. Bascus told Mondello that "Mike" (Officer Glick) was back in Cheyenne and had "four big ones" (four ounces of cocaine) for Mondello. Mondello could pay for two ounces and would be "fronted" the other two to sell. Mike would set off the $300.00 still owed to Mondello against the price of the cocaine. Bascus told Mondello that Mike would only agree to front to Mondello, not Bascus, because Mike and Mondello knew each other. Bascus tried to arrange a rendezvous at the Flying J truck stop, but Mondello said he had to work and agreed only to have Jones call Bascus if he arrived that day.

Bascus managed to reach Jones at home that same afternoon. Bascus was still calling from the tapped phone. The transcript of this conversation shows that Jones thought Mondello would be reluctant to go along with Bascus' plan. Bascus described Mike's offer of the four ounces of cocaine. Jones told Bascus that Mondello would not want to buy even two ounces. Bascus offered to chip in another $700.00 so that Mondello could buy two ounces. Jones told Bascus that Mondello only wanted "what he wants * * *. He don't even want to have nothing extra or nothing." Jones said Mondello was "just going to wait till somebody keeps getting 8ths, or more so he could, 'cause that is what he wants * * *." Jones finally said he was willing to "go [along] for the ride," but he had to check it out with Mondello.

Bascus again reached Jones later that day. Jones indicated that Mondello wanted Jones to go to meet Mike at the Flying J truck stop. However, Jones did not have access to a car. Bascus agreed to give Jones a ride. While they were travelling in Bascus' car, Bascus and Jones discussed Mike's offer again. Jones told Bascus that, although he wanted all four ounces, it was up to Mondello whether the transaction would be made because Mondello had the money. (This conversation was apparently not recorded.)

Bascus and Jones ended up at Parkway Pizza, the business owned by Mondello and his wife. They were unable to discuss the drug transaction in detail because Mondello's wife was present. However, Jones later told Bascus that, during the visit to

Parkway Pizza, Mondello gave Jones a total of $1,000.00 to buy cocaine: $300.00 from a cash register and $700.00 he had concealed in his sock.

Jones and Bascus proceeded to the Time Out, a video arcade. On the way, they had a conversation concerning cocaine. Bascus was wearing a body mike, but the sound quality was so poor, the tape was not played for the jury except to demonstrate the poor sound quality. Neither Mondello nor Jones met with Mike (Officer Glick) that day.

Later in the afternoon, Bascus placed a recorded call to Jones and informed him that Mike (Officer Glick) was not able to meet with them that day because it was raining and hailing in Denver, and Mike could not ride his motorcycle in the rain up to meet them. Bascus told Jones that he had instructed Mike to call Mondello. Jones remarked that "I don't think he [Mondello] will want it." Jones asked Bascus about "another place" where Bascus could obtain an ounce of cocaine. Bascus said he would try.

Officer Glick, again posing as Mike Melvin, called Mondello at 4:30 p.m. that afternoon to apologize for not being able to make the delivery. Mike (Officer Glick) told Mondello that it had rained and that he was stuck in Denver because he could not ride his motorcycle safely in the rain. Mondello and Glick talked in coded language because of Mondello's (justified!) fear that his phone might be tapped. Glick suggested Mondello take "four cases" (ounces), and Mondello indicated he was interested in two. Mondello inquired as to the purity of the cocaine ("skim" v. "100% whole milk") and, when told that it was "100% whole milk," stated cryptically "[y]eah, people like better like that." The two agreed to a price of $900.00 per ounce for the cocaine.

On the next day, Glick placed several calls attempting to get back with Mondello and to reach Jones. He finally was able to speak to Mondello. Mondello asked Glick if he had been able to contact Chris Bascus; Glick responded that he had. Mondello told Glick that the deal "look[ed] like it

[was] up in the air" because there were "too many things around * * * [t]oo many bad guys." Glick then offered to sell Mondello just two ounces. Mondello was very reluctant; he expressed a fear that the sale would "put [Mondello] in jeopardy." Mondello told Glick to come back next week because he already had plenty of cocaine; Glick could perhaps bring five cases (ounces) the next week and leave them with Mondello for five days. Glick's impression of the conversation was Mondello seemed "a little * * * 'cool' * * *. He didn't seem like he wanted to deal."

Glick waited a week and then contacted Mondello again on June 20, 1990. Glick told Mondello that he had just received a call from Chris Bascus and that he was ready to meet Mondello out at the Flying J truck stop. Mondello offered to send either a member of his family or Chris Bascus out to meet Glick, but Glick stated he would much rather meet with Mondello. The two arranged for a meeting a half hour later at the Flying J.

The day before, on the 19th, Chris Bascus had called Jones to let him know that Glick would be in town the next day. Bascus let Jones know that Glick would sell two ounces for $1,800.00. Jones said he would let Mondello know. Bascus exhorted Jones that he could "get rid of [i.e. sell] [the cocaine] fast." Bascus then told Jones he would like to get ahold of an "eighth." Jones said he would "check it out."

Bascus called Jones back to ask if he had talked to Mondello and to advise him that Glick would be in town about 2:00 that day. Jones said he had not talked to Mondello but would attempt to do so and would call Bascus back. Bascus called twice more. On the second phone call, Jones told him he "didn't know" whether the transaction would work. Bascus said he would take one of the ounces, and Jones asked him if the price was two ounces for $1,500.00. Bascus responded in the affirmative.

Jones called Bascus later that afternoon to advise him that he had $750.00, enough money to buy one ounce. Bascus responded that he did not know if Glick would deal with them for only one ounce. Bascus

asked Jones to come up with another $750.00 for a second ounce. Jones said Mondello did not have it. Bascus said he would call Jones back, but he doubted the deal could go through for only one ounce. This was Bascus' last call to Jones.

Officer Glick wore a body mike to the rendezvous with Mondello at the Flying J. Mondello was waiting at the information center, just north of the Flying J, and so Glick went to meet him there. Mondello stated he had six hundred dollars with him. Glick told Mondello that he had the cocaine packaged in two ounce lots and did not have a scale to divide them. Glick instructed Mondello to sell the other ounce and keep the money for him until his return; if Mondello did this, Glick promised to "furnish [Mondello] forever." Mondello showed some hesitancy, but accepted the two ounces. Glick kept up a steady stream of encouragements as Mondello left him: "make sure you get a good price"; "don't get less than two and a half an eighth for it"; "just remember to get a good price for that stuff." Then the police closed in on Mondello and arrested him.

On July 2, 1990, the State filed an Information charging Jones with one count of conspiracy to deliver marijuana and cocaine under W.S. 35–7–1042 (June 1988 Repl.) and an Information charging Mondello with one count of conspiracy to deliver marijuana and cocaine under W.S. 35–7–1042 and with one count of possession of cocaine with intent to deliver under W.S. 35–7–1031(a)(i) (June 1988 Repl.). The trial court approved the State's motion for joinder of the defendants' trials and denied Mondello's motion for severance.

At trial, the district court ruled inadmissible evidence of an alleged prior conspiracy in March of 1989 in which Mondello and Glick agreed to go together to New Jersey, where Mondello would introduce Glick to a "Columbian connection" who would supply them with cocaine. Mondello's attorney stated that he was not going to raise an entrapment defense at trial, and so the evidence of a prior conspiracy was not relevant to the issue of Mondello's predisposition to commit the crime charged.

The consolidated trial was held September 4–5, 1990. After six hours of deliberation on September 5 and a full day's deliberation on September 6, the jury had reached a guilty verdict on the conspiracy charges against both Jones and Mondello but was deadlocked on the possession with intent to distribute charge against Mondello. The court allowed the jury to announce its verdicts of guilty as to the charges of conspiracy to distribute marijuana and cocaine and then declared a mistrial as to the possession charge against Mondello. The court denied the defendants' motion for a new trial on October 15, 1990. It sentenced Mondello to 16 to 32 months imprisonment and Jones to 20 to 40 months imprisonment. Appellants took timely appeal from the court's sentencing orders.

We reverse appellants' convictions because the State failed to prove beyond a reasonable doubt the alleged conspiracy to distribute marijuana and cocaine. Because of the reversal on this issue, we need not consider the numerous other issues the parties raise, with the exception of Mondello's third issue, which raises important policy questions for this state.

### Outrageous Government Conduct

█ In Mondello's third issue, he alleges that his conviction must be reversed because the government's role in the conspiracy was so substantial that it violated his right to due process of law under the United States Constitution. *See Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). We have not previously recognized a defense of "outrageous government conduct" in Wyoming. We now hold that such a defense is available under the appropriate circumstances, but that the government's conduct in Mondello's case did not rise (or better "sink") to the level required for application of the doctrine.

A review of the cases which established the doctrine is helpful to determine its parameters. In *United States v. Russell*, the defendant was convicted of unlawfully

manufacturing, processing, selling and delivering methamphetamine. A governmental agent had supplied the defendant with phenyl–2–propanone (P–2–P), a chemical essential to the manufacturing process. On appeal, the defendant conceded being predisposed to manufacture methamphetamine, thus foreclosing a "subjective" entrapment defense. He argued, however, that his conviction should be overturned because of an intolerable degree of governmental participation in the crime for which he was convicted. Although the Court refused to reverse Russell's conviction on these grounds, the majority stated in dicta that:

> [W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, *cf. Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) * * *.

*Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1643.

*Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396 (1952) is the infamous "stomach-pump" case in which the Supreme Court refused to allow evidence of drugs forcibly pumped from the defendant's stomach to be used to convict him. The conduct of police in that case was said to have "shocked the conscience" of the Court. *Rochin*, 342 U.S. at 172, 72 S.Ct. at 209. An "outrageous government conduct" test measured by *Rochin* criteria is, accordingly, confined to very narrow circumstances, where the police conduct is "violat[ive of] that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Russell*, 411 U.S. at 432, 93 S.Ct. at 1643.

Three years after the *Russell* decision, in *Hampton v. United States*, the Court considered a challenge to a conviction for distributing heroin. The defendant objected to the trial court's refusal of his proposed "entrapment" instruction which would have informed the jury that they must acquit him if they found that the drugs he sold were supplied to him by the government. Like *Russell*, the defendant conceded that he was predisposed to sell heroin, but argued that he was entitled to the instruction because it reflected the outrageous government conduct rule mentioned in the *Russell* dicta. A plurality of the Court (Justices Rehnquist and White and Chief Justice Burger) saw no essential difference between the defendant's situation in *Hampton* and that in *Russell*, and affirmed Hampton's conviction. Justice Powell, joined by Justice Blackmun, concurred in the judgment. Although they would not establish a per se rule of denial of due process when the government supplied contraband to the defendant, they could conceive of rare cases in which outrageous government conduct could be successfully asserted as a defense to a drug charge. *Hampton*, 425 U.S. at 494–95, 96 S.Ct. at 1652–53. Justice Brennan, joined by Justices Stewart and Marshall in dissent, rejected the entire concept that entrapment is based on the "subjective" criteria of the defendant's predisposition to commit the crime. Instead, they stated, courts refuse to convict an entrapped defendant because " 'the methods employed on behalf of the Government to bring about conviction cannot be countenanced.' " *Hampton*, 425 U.S. at 496, 96 S.Ct. at 1653, *citing Sherman v. United States*, 356 U.S. 369, 380, 78 S.Ct. 819, 824, 2 L.Ed.2d 848 (1958) (Frankfurter, J., concurring). Thus, five out of eight justices (Justice Stevens did not vote) stated that an "objective" defense based on government conduct was available.

Despite the dicta in the *Russell* case and the concurring and dissenting opinions in *Hampton*, the United States Supreme Court has never applied an "outrageous government conduct" rule to actually overturn a defendant's conviction.[1] Further-

---

1. Recently the United States Supreme Court faced this issue and, while the government's conduct in pursuing defendant was questioned, it reversed the conviction for violating federal child pornography laws based on the defense of "entrapment." The Court held that the government failed to prove that the defendant had the requisite predisposition to commit the crime

more, although state and federal courts have at least paid lip service to the doctrine, the defense referred to in *Russell* and *Hampton* has not had broad application. In the words of the Tenth Circuit Court of Appeals, the defense is "often raised but is almost never successful." *United States v. Gamble,* 737 F.2d 853, 857 (10th Cir.1984). The murky bottom of the judicial seascape is littered with the wrecks of hopeful appeals in which defendants have launched claims of outrageous government conduct (in some cases much more egregious than that contended here) only to watch them sink after running aground on the difficult hurdle of proving the requisite level of outrageous conduct. A 1990 A.L.R. annotation, for example, lists over fifty federal drug decisions in which the actions of government agents were held not to have violated the defendant's right to due process. Only four cases are mentioned in which a due process/outrageous conduct defense was successful. Two of these were trial court decisions. T. Thomas, Annotation, *What Conduct of Federal Law Enforcement Authorities in Inducing or Co-operating in Criminal Offense Raises Due Process Defense Distinct from Entrapment,* 97 A.L.R.Fed. 273 § 3[a]–[g] (1990).

The case most often cited by courts (and now by Mondello) in which an outrageous government conduct defense succeeded in the drug context seems to be *United States v. Twigg,* 588 F.2d 373, 376–78 (3rd Cir.1978). In *Twigg,* the government initiated a conspiracy to produce methamphetamine, supplied the P–2–P needed, provided about 20 percent of the glassware needed and the site for the methamphetamine laboratory, and made arrangements with chemical supply houses to facilitate purchase of the other necessary materials. Twigg could not assert an entrapment defense because he was brought into the conspiracy by one of the conspirators rather than by a government agent. Neither could another defendant, Neville, assert entrapment who had been shown to be predisposed to commit the crime. Nevertheless, the Third Cir-

cuit Court of Appeals reversed both convictions:

> When Kubica [a government informant], at the instance of the DEA, reestablished contact with Neville, the latter was not engaged in any illicit drug activity. Using Kubica, and actively participating with him, the DEA agents deceptively implanted the criminal design in Neville's mind. They set him up, encouraged him, provided the essential supplies and technical expertise, and when he and Kubica encountered difficulties in consummating the crime, they assisted in finding solutions. This egregious conduct on the part of government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred.

\*     \*     \*     \*     \* ·     \*

> Twigg did not become involved in this criminal enterprise until March 1, 1977—the day the laboratory went into operation. His reason for becoming involved was to repay a debt owed to Neville. Neville introduced Twigg to Kubica, and then Twigg and Kubica went shopping for additional supplies, which Kubica purchased. There is no evidence to suggest that Twigg was aware of the ultimate purpose of these errands until informed by Kubica after returning to the farmhouse. All actions taken by Twigg from that time until his arrest were at the specific direction of Kubica, the government agent. Twigg contributed nothing in terms of expertise, money, supplies, or ideas. It also appears that Twigg would not even have shared in the proceeds from the sale of the drug. In light of these facts, we hold that Twigg's conviction is also tainted by the conduct

prior to the intervention of governmental agents who sought to create the predisposition. *Jacob-*

*son v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1543, 118 L.Ed.2d 174 (1992).

of the DEA agents and that fundamental fairness requires its reversal.

*Twigg*, 588 F.2d at 381–82.

Like the defendants in *Twigg*, Mondello cannot assert entrapment on appeal. At trial, Mondello gave up his right to the entrapment defense in exchange for the State being barred from using evidence of certain previous discussions between Mondello and Officer Glick. These discussions took place in March of 1989, around the time Glick first met Mondello and prior to the alleged conspiracy charged in this case. Mondello allegedly offered to introduce Glick to his "Columbian connection" in New Jersey, and to help Glick purchase three-quarters of a pound of cocaine. Had Mondello raised entrapment, the State would have been allowed to bring in these discussions as evidence of his predisposition to distribute cocaine. *See Noetzelmann v. State*, 721 P.2d 579, 581 (Wyo. 1986) (entrapment is not available if defendant is ready to commit the offense, given the opportunity).

██ The State now argues that in making this strategic decision at trial, Mondello also gave up the outrageous government conduct defense. The argument is that had Mondello retained the outrageous government conduct defense, the excluded evidence would have been admissible to show the pre-existence of a criminal enterprise, which the State merely joined in order to convict the perpetrators. However, the State has not shown how Mondello's isolated actions in March 1989 were part of an ongoing criminal enterprise connected with his subsequent actions. We find it unnecessary to consider whether evidence of Mondello's prior misconduct would have been admissible on the issue of outrageous government conduct when the defense was rejected as a matter of law. Under the circumstances, we hold that Mondello did not waive the defense of outrageous government conduct.

██ Turning to the applicability of the defense, the evidence in this case shows that Mondello planned to buy one ounce of cocaine for his personal use. The government tricked him into buying two, and told him to sell one of them, when by all accounts he had no previous intention *in the course of the alleged conspiracy* to do so. As will be discussed below, this means there is insufficient evidence that Mondello conspired to sell marijuana and cocaine in the manner charged by the State, and his conviction must be reversed. However, the police conduct in tricking and cajoling Mondello is distinguishable from that in *Twigg* in that when the State became involved, Mondello and Jones had already sought out Bascus to purchase cocaine. Thus, the level of police involvement in the enterprise does not sink to the level of outrageous government conduct as defined in *Twigg*. Nor does the police conduct in using Bascus to arrange and perpetuate the alleged conspiracy itself sink to such level. *See e.g., United States v. Tavelman*, 650 F.2d 1133 (9th Cir.1981), *cert. denied* 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982) (holding similar conduct not to violate due process). Therefore, we hold that the outrageous conduct defense exists in Wyoming but that it does not apply under the circumstances of Mondello's case.

### Sufficiency of the Evidence

Both Mondello and Jones next raise the issue of whether sufficient evidence exists to establish the conspiracy charged. Because we hold there is not sufficient evidence, we must reverse both convictions.

Our standard of review of sufficient evidence for a jury's verdict was recently set forth in detail in *Rathbun v. State*, 802 P.2d 881, 882–83 (Wyo.1990):

We examine whether the evidence most favorable to the State is sufficient to infer reasonably that a statute was violated as charged. Our examination involves a two stage process.

When examining if the verdict is supported by sufficient evidence, we review the record to examine "all the evidence in the light most favorable to the State * * *." *Mendicoa* [*v. State* ], 771 P.2d [1240,] 1243 [Wyo.1989]. We examine the evidence from this perspective because we defer to the jury as the factfinder and assume they believed only the

evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt. We are aware the defendant's version argued for a finding of "not guilty" while the prosecutor's version argued for a finding of "guilty." Had the jury found the defendant's version credible, they would be bound to harbor reasonable doubt against the prosecutor's claim that the defendant was guilty. But they did not find the defendant's version credible and therefore found him guilty beyond a reasonable doubt. We do not ask if " 'the evidence establishes guilt beyond a reasonable doubt for us * * *,' " *Id.* at 1243 (quoting *Broom v. State,* 695 P.2d 640, 642 (Wyo.1985)), because the answer to that question would require this court to weigh the evidence and determine who was most credible. That determination simply is not a function of this court. "[W]e are not to reweigh the evidence." *Broom,* 695 P.2d at 641.

Second, after drawing into the open only the evidence adverse to the defendant, we examine whether that evidence permits the jury's inference that the defendant violated the elements of the statute as charged. Our focus is singular and only examines the *reasonableness of the inference* from premises admittedly adverse to the defendant. *See Broom,* 695 P.2d at 642. [emphasis in original; some citations omitted]

■ To prove a conspiracy under Wyoming's controlled substances conspiracy statute, it is not necessary to show that the parties to the conspiracy performed an overt act to effect the objective of the agreement. *Bigelow v. State,* 768 P.2d 558, 561 n. 6 (Wyo.1989); *Apodaca v. State,* 627 P.2d 1023, 1026 (Wyo.1981). All that must be shown is that the parties agreed to commit an offense under Article V of the Controlled Substances Act. W.S. 35–7–1042. We have used the following language to describe the agreement which the prosecution must prove under the general conspiracy statute, which applies equally to conspiracy to deliver a controlled substance:

One might suppose that the agreement necessary for conspiracy is essentially like the agreement or "meeting of the minds" which is critical to a contract, but this is not the case. Although there continues to exist some uncertainty as to the precise meaning of the word in the context of conspiracy, it is clear that the definition in this setting is somewhat more lax than elsewhere. A mere tacit understanding will suffice, and there need not be any written statement or even a speaking of words which expressly communicates the agreement. * * *

Because most conspiracies are clandestine in nature, the prosecution is seldom able to present direct evidence of the agreement. Courts have been sympathetic to this problem, and it is thus well established that the prosecution may "rely on inferences drawn from the course of conduct of the alleged conspirators." [footnotes omitted]

W. LaFave and A. Scott, *Criminal Law* 460–61 (1972), quoted in *Burke v. State,* 746 P.2d 852, 855 (Wyo.1987) and also in *Bigelow,* 768 P.2d at 562.

■ The charge against Mondello and Jones was conspiracy to deliver marijuana and cocaine. The only direct evidence of the claimed conspiracy was provided by Bascus' testimony concerning what he, Jones and Mondello agreed to. The State had Bascus on a drug-pushing rap, and he testified to get lenient treatment for himself. Significantly, Bascus admitted at trial that after the crucial conversation with Jones and Mondello in which they allegedly developed the conspiracy, he told Officer Farmer that Mondello had told him to "think about it for a couple of days," and that Mondello would get back to him. This suggests the parties were still in the negotiation stage, and had not yet reached agreement to actually buy or sell marijuana and cocaine.

Mondello did not reinitiate contact with Bascus. It was Bascus who called Mondello and Jones repeatedly in the days afterward. In the course of these conversations, Jones repeatedly told Bascus that he would defer to Mondello's decision on

whether a purchase would be made and made statements implying that Mondello only wanted enough cocaine for his personal use. Jones did say "I would go for the ride right now," referring to Bascus' offer of two ounces, but his statement in context indicated that his participation was conditional on Mondello's approval.

At times, Mondello indicated a willingness to buy more than one ounce of cocaine and to sell the excess. However, there is no evidence linking Mondello's statements, which came in response to subsequent offers by Detective Glick, to the originally-charged conspiracy to sell marijuana and cocaine. Furthermore, the telephone conversations never show Mondello agreeing unequivocally to buy cocaine for reselling purposes. Nor does Jones agree, without conditions, in the telephone transcriptions. In fact, as late as the day before Mondello's arrest, Jones was still saying he would "talk to" Mondello about a deal for two ounces. The day of the arrest, in his last conversation with Bascus, Jones stated that *Mondello only wanted one ounce*, much to Bascus' disappointment.

Officer Farmer testified that he heard Jones and Bascus discussing selling "eight balls" inside Parkway Pizza over a body mike Bascus was wearing. However, he admitted on cross-examination that the sole purpose of setting up Bascus in business was to insure a supply of eight balls for Mondello personally, and that it was "not impossible" that Bascus and Jones were discussing that when they spoke of eight balls.

The evidence, then, shows that according to Bascus the parties discussed selling small quantities of cocaine and marijuana to support Mondello's habit at their initial meeting, but they never concluded an *agreement* to do so. If we believe Bascus, the initial meeting failed to produce anything but a tentative plan and a promise to discuss the plan further at a later date. The State then intervened, in tapped phone conversations with the defendants, with suggestions, proposals and counterproposals for purchases or sales of larger amounts of cocaine. The transcripts of these phone conversations are colored by Mondello's reluctance to buy the large amounts the State was pushing, his desire expressed through Jones to buy only for his own use, and Jones' reluctance to act without Mondello's consent. Noticeably absent from the calls is any further reference to the original, alleged conspiracy to distribute marijuana and cocaine.

■ More importantly, the prosecution failed to tie the final "buy" by Mondello to the agreement Bascus reported. To do so based on the evidence presented would have been difficult. Perhaps recognizing this, at one point the prosecutor took a shortcut by arguing to the jury that Officer Glick's "delivery" of the cocaine to Mondello was the "delivery" intended in the originally-charged conspiracy. This argument was improper and was erroneous as a matter of law. It had the potential to mislead the jury and to thereby create reversible error. *See United States v. Coward*, 630 F.2d 229 (4th Cir.1980) (proof of conspiracy which differed from that charged confused the jury and required reversal).

■ If the prosecutor's argument were believed, the jury could have found Mondello guilty of a conspiracy to deliver cocaine *to himself.* This is clearly wrong; we have stated that "[t]he [mere] purchaser of controlled substances [i.e. Mondello] commits the crime of 'possession' and not 'delivery.'" *Wheeler v. State*, 691 P.2d 599, 602 (Wyo.1984). The purchaser is not an accomplice in a sale to himself. *Id.* Nor is he a conspirator to deliver to himself. For a conviction of conspiracy to *deliver* cocaine, there must be a showing that the conspirators agreed to make some further distribution of the cocaine. That is what is missing from this case.

The jury obviously did not agree that Mondello possessed the cocaine he bought from Glick with intent to further deliver it, since they hung on the "possession with intent to deliver" count, causing a mistrial. The facts support the jury's reluctance to convict. When Mondello met with Officer Glick, he brought only enough money for one ounce of cocaine. This supports the

defense's theory, which was that Mondello only intended to buy for his personal use. Glick had to persuade Mondello to accept two ounces instead of one by stating it was in one pack, he could not divide it, and by fronting Mondello the second ounce and telling him to sell it. Inherent in Glick's insistence was the recognition that Mondello planned to keep the other ounce, the one he *intended* to buy, for his own use.

■ This is a case where the parties discussed buying cocaine and where one of them did so. They also discussed selling cocaine, mostly in discussions initiated by the government, but never agreed to nor did they sell any. Mere discussion without agreement is not a conspiracy. *See United States v. Iennaco*, 893 F.2d 394, 397 (D.C.Cir.1990) ("negotiations, solicitations and counteroffers" not agreement for purposes of conspiracy); *United States v. Jones*, 765 F.2d 996, 1003 (11th Cir.1985) (defendant's proposals to undercover narcotics agent, which required acceptance the agent never gave, did not constitute a criminal conspiracy); *United States v. Melchor–Lopez*, 627 F.2d 886, 891–92 (9th Cir. 1980) (unacceptable conditions attached to conditional agreement and "agreement to negotiate a purchase" rather than agreement to purchase did not constitute conspiracy); *United States v. Steinberg*, 525 F.2d 1126, 1134 (2nd Cir.1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976) (equivocal statements, without "fixed agreement" to participate did not justify conviction for conspiracy).

■ In conspiracy, the agreement itself is the criminal act which is punished because it constitutes "a step toward the accomplishment of a specific anti-social act." Albert J. Harno, *Intent in Criminal Conspiracy*, 89 U.Pa.L.Rev. 624, 635 (1941). Since the agreement forms the *actus reus*, the State must prove beyond a reasonable doubt that it exists in order to convict the defendant of conspiracy. The rule of evidence that an agreement may be inferred from surrounding circumstances must not be applied at the expense of the rule of law that an agreement must be established. *Melchor–Lopez*, 627 F.2d at 891, *quoting Developments in the Law of Criminal Conspiracy*, 72 Harv.L.Rev. 920, 933 (1959). Here, an agreement was not established based on the evidence proved at trial.

Finally, we wish to discuss the State's conduct in this case. They had an admitted drug dealer, Chris Bascus. They knew Mondello wanted drugs for his own use. They could have charged Mondello with possession and use of illegal drugs. But the State apparently wanted a "big drug case." They used Bascus to make a case of possession with intent to sell and a conspiracy against Mondello, the user, and his friend Jones. Meanwhile, Bascus essentially got a free pass. The scenario may be analogous to a manufacturer who knowingly and fraudulently sells a defective product, is not prosecuted, and yet all of his customers are charged with conspiracy to buy and resell his product.

We hold that there was insufficient evidence for either Jones' or Mondello's conviction of conspiracy. This decision is based on the prosecution's specific failure in this case to prove a conspiracy *to deliver* marijuana and cocaine. For this reason, appellants' convictions are reversed.

GOLDEN, J., files a specially concurring opinion.

THOMAS, J., files a dissenting opinion.

GOLDEN, Justice, specially concurring.

I specially concur. As the majority opinion notes, in conspiracy the criminal act that the state must prove beyond a reasonable doubt is the agreement. In this case, the state's evidence did not prove the existence of the agreement.

THOMAS, Justice, dissenting.

I must dissent from the disposition of this case according to the majority opinion. It is seldom a failure of logic like that manifested here is found in a court opinion. The majority carefully sets forth the material facts, and it states the applicable rules of law. It then misapplies those rules in such a way that it substitutes itself for the jury, not only reweighing the evidence, re-

lying substantially on the version of the facts submitted by Mondello and Jones, but then deciding the case in this court, in effect, concluding it is not persuaded of guilt beyond a reasonable doubt, which it describes as insufficiency of the evidence. It seems to me that, having discerned no unlawful conduct on the part of the officers, this court decided to rectify a situation that offended the court by nullifying the jury verdict. It then substituted its perception of the evidence for that of the jury and acquitted the defendants.

I quote the material testimony from the majority opinion:

> Bascus, unknown to Mondello and Jones, had been arrested for selling cocaine and had turned informant for the government, *i.e.*, cut a deal in which he would make a case against Mondello and avoid prosecution for his own crime. He testified at trial that the deal Mondello offered was to give Bascus $1,350.00 to buy an ounce of cocaine. Bascus was then to sell the cocaine and use the profits to buy more cocaine. Mondello would take back his stake in the form of either "an eight ball a week" for his personal use, or in cash. Bascus further testified that Mondello suggested that Bascus invest in and sell marijuana to build up his money supply faster. Bascus testified that Mondello was not interested in marijuana for his personal use, only cocaine. The plan also called for Jones to help sell whatever Mondello did not use. It was Bascus' testimony about this plan which formed the alleged conspiracy of which Mondello and Jones were convicted.

At 1154–1155.

The court goes on to correctly state the standard pursuant to which the evidence is to be reviewed quoting from *Rathbun v. State*, 802 P.2d 881, 882–83 (Wyo.1990), this language, which is repeated for emphasis:

> We examine whether the evidence most favorable to the State is sufficient to infer reasonably that a statute was violated as charged. See *Mendicoa v. State*, 771 P.2d 1240, 1243 (Wyo.1989); *Seeley v. State*, 715 P.2d 232 (Wyo.1986);

*Chavez v. State*, 601 P.2d 166 (Wyo. 1979); and *Cheng v. Com.*, 240 Va. 26, 393 S.E.2d 599, 608 (1990). Our examination involves a two stage process.

When examining if the verdict is supported by sufficient evidence, we review the record to examine "all the evidence in the light most favorable to the [s]tate * * *." *Mendicoa*, 771 P.2d at 1243. We examine the evidence from this perspective because we defer to the jury as the factfinder and assume they believed only the evidence adverse to the defendant since they found the defendant guilty beyond a reasonable doubt. We are aware the defendant's version argued for a finding of "not guilty" while the prosecutor's version argued for a finding of "guilty." Had the jury found the defendant's version credible, they would be bound to harbor reasonable doubt against the prosecutor's claim that the defendant was guilty. But they did not find the defendant's version credible and therefore found him guilty beyond a reasonable doubt. We do not ask if " 'the evidence establishes guilt beyond a reasonable doubt for us * * *,' " *Id.* at 1243 (quoting *Broom v. State*, 695 P.2d 640, 642 (Wyo.1985)), because the answer to that question would require this court to weigh the evidence and determine who was most credible. That determination simply is not a function of this court. "[W]e are not to reweigh the evidence." *Broom*, 695 P.2d at 641.

Second, after drawing into the open only the evidence adverse to the defendant, we examine whether that evidence permits the jury's inference that the defendant violated the elements of the statute as charged. Our focus is singular and only examines the **reasonableness of the inference** from premises admittedly adverse to the defendant. *See Broom*, 695 P.2d at 642.

To the same effect are *e.g., Wehr v. State*, 841 P.2d 104 (Wyo.1992); *Bouwkamp v. State*, 833 P.2d 486 (Wyo.1992); *Scadden v. State*, 732 P.2d 1036 (Wyo.1987); *DeSersa v. State*, 729 P.2d 662 (Wyo.1986); *Roose v. State*, 759 P.2d 478 (Wyo.1988); *Righter v. State*, 752 P.2d 416 (Wyo.1988);

*Carson v. State,* 751 P.2d 1315 (Wyo.1988); and *Griffin v. State,* 749 P.2d 246 (Wyo. 1988).

The majority, immediately after reviewing the standard for reviewing the sufficiency of the evidence, correctly reports:

> To prove a conspiracy under Wyoming's controlled substances conspiracy statute, it is not necessary to show that the parties to the conspiracy performed an overt act to effect the objective of the agreement. *Bigelow v. State,* 768 P.2d 558, 561 n. 6 (Wyo.1989); *Apodaca v. State,* 627 P.2d 1023, 1026 (Wyo.1981). All that must be shown is that the parties agreed to commit an offense under Article V of the Controlled Substances Act. W.S. 35–7–1042. We have used the following language to describe the agreement which the prosecution must prove under the general conspiracy statute, which applies equally to conspiracy to deliver a controlled substance:

>> One might suppose that the agreement necessary for conspiracy is essentially like the agreement or "meeting of the minds" which is critical to a contract, but this is not the case. Although there continues to exist some uncertainty as to the precise meaning of the word in the context of conspiracy, it is clear that the definition in this setting is somewhat more lax than elsewhere. A mere tacit understanding will suffice, and there need not be any written statement or even a speaking of words which expressly communicates the agreement. * * *

>> Because most conspiracies are clandestine in nature, the prosecution is seldom able to present direct evidence of the agreement. Courts have been sympathetic to this problem, and it is thus well established that the prosecution may "rely on inferences drawn from the course of conduct of the alleged conspirators." [footnotes omitted]

> W. LaFave and A. Scott, *Criminal Law* 460–61 (1972), quoted in *Burke v. State,* 746 P.2d 852, 855 (Wyo.1987) and also in *Bigelow,* 768 P.2d at 562.

At 1161–1162.

In light of what the majority espouses as correct rules relative to proof of conspiracy and sufficiency of the evidence, the statement that, "[m]ore importantly, the prosecution failed to tie the final 'buy' by Mondello to the agreement Bascus reported", at 1162, is a classic non sequitur. Since the rule is that there is no necessity for proof of an overt act to establish the conspiracy, why should the prosecution "tie the final 'buy' by Mondello" to the charged conspiracy. That offense was complete upon proof of an agreement to violate the Controlled Substances Act. The testimony from Bascus that is quoted above certainly establishes such an agreement.

Apparently recognizing, at least at a subliminal level, the difficulty with the logic, the majority, in direct violation of the rules pertaining to the standard for sufficiency of the evidence, quotes and describes other testimony the majority perceives as contradictory. In essence, the majority weighs the evidence and concludes the court is not persuaded of guilt beyond a reasonable doubt. This is a clear substitution of the court for the jury; an invasion of the jury's prerogative; and a violation of a fundamental rule of appellate jurisprudence. The further argument about the apparent inconsistency in the verdicts is nothing more than a judicial hare. It is entirely possible, if speculation is permitted, that the jury was not persuaded beyond a reasonable doubt that Mondello received the cocaine from Glick for resale rather than personal use and, yet, was persuaded beyond a reasonable doubt that a conspiracy was formed in June of 1990 for Mondello, Jones, and Bascus to market cocaine in order to finance Mondello's personal habit.

I would affirm the judgments and sentences in this case.